First matter is Ohio Public Employees v. Discovery. Case number is 24-646. I see that Mr. Berry is here for the appellants and you've reserved three minutes for rebuttal. You may take the podium and begin when you're ready. Good morning, Your Honors. Good morning, and may it please the Court. This acquisition was pitched as creating a streaming powerhouse that would catch up with Netflix and Disney Plus. And its running start was the new company's combined 95.8 million subscribers, which the CEO marketed as almost double the number of subscribers. And the acquisition was a success. And the acquisition was a success. But in the August earnings call that followed the merger, the leadership announced that they were dropping the subscriber count by 11 percent. That's 10 million people, more than two years of subscriber growth for the company. The reason was, quote, to provide you with a clear and transparent number of true paying subscribers to our core service, unquote. Providing these true figures after the fact is as close to a smoking gun admission as you're ever going to see. True paying subscribers. Again, these are the company's own words. Now, when securities filings speak on an issue or topic, here we've got 96 million subscribers, there is a duty to tell the whole truth. Ten million of them are not true paying subscribers to our core service. Weren't there some disclosures in the paperwork that sort of expressed that this could mean wholesale distributed accounts and other kinds of accounts? So there is, you're right, Your Honor, that there is a definition given. We've argued that the definition itself is confusing and misleading. But the most important thing about it was the number, the population, the magnitude of who we're talking about. That was never disclosed. We could have theoretically the same case if disclosures were the same and yet it was 95 million who dropped off after the merger. It would be, that would be highly material, as material as it gets. And under my opponent's theory, there would have been no duty to disclose that. This is out of line with the Second Circuit's own precedence. There is no, we agree that there is not a freestanding duty to disclose all material information. But that's not, that's not this case. So is there a number if it were two subscribers? I mean, they must be talking about something. Right. When they tell you that there's, you know, this aggregates a bunch of different things. Yes. So is there a magic number? You're saying that they would argue that even 95 percent would be okay. You're saying that 10 or 11 percent is not okay. So, Your Honor, I think the right concept to apply here is materiality. And so materiality is a somewhat slippery concept. Well, we're starting with whether it's, we're not, before we get to materiality, we're starting with whether this is even an omission that is actionable. When it comes to the duty to disclose, Your Honor, materiality does come in as a, it has a secondary effect. I'll read from, this is this Court's opinion in the Setzer case that's right at the top of our opening brief. There is a duty not to omit material facts whose, material facts whose omission in light of what was stated would be misleading. That's, so if it was, if it was two human beings, two people who are not, who are going to drop off, that would not be material. And as a result, this would not be misleading. This is that type of case where materiality actually helps trigger this supplemental duty to disclose of the kind talked about by Setzer. Are you disputing the accuracy of the number disclosed based on the methodology that was also disclosed? Are you disputing that the number was correct? We are, Your Honor, we would argue that it's misleading. That, and indeed the whole, as the, as the, you know, the CEO's statements about almost 100 million indicate, the whole, the whole intent here was to, was to represent the strength of the company's subscriber base. Are you aware of any case where a defendant disclosed an accurate description of the methodology, which seems to be the case here, and then an accurate final metric based on that methodology, and that was found to be materially misleading? So you're, I guess, Your Honor, we would, like, we would contest that this is, that this is accurate, that this was given with the precision necessary, especially given, you know, we now have these, these after-the-fact and litigation clarifying statements, supposedly, about what the definition means. But even if, to use, to use my learned opponent's formulation, even if the definition said, this is from page 32 of their brief, these are subscribers not likely to pay separately for HBO, HBO Max, if they lost access to their bundle. Again, that's not what the disclosure says, but that's, that's their post hoc re-articulation. The omission of the fact that we're up to 10 million people were not actually, were not actually part of it makes that inaccurate, essentially. Those, those 10 million, the company gets revenue anyway. It streams to them and gets revenue on their account, correct? So, Your Honor, after... Even if it's bundled. Well, even as... If it's bundled, there's still revenue to be gained from it. Your Honor, the, we have at one of the, one of the investment analysts, after the corrective disclosure, after the August earnings call, he said, quote, we expect the revenue associated with never activated AT&T customers to degrade fairly quickly. So that's at paragraph 129 of our complaint or joint appendix page 63. So those... Is that, is that because they were going to be unplugged? This, so, I mean, to use, to use their own words at page 32, these are subscribers not likely to pay separately if they lost access to their bundle. And that, that bundling was to, to our understanding, it was going to cut off. Is that any sign they're losing access to the bundling? The, so our, our allegation of this revenue degrading fairly quickly, I think, goes to that issue, Your Honor, that the inference is that the revenue is not going to, is not going to be there going forward. Counsel, if you want to briefly address your other points, or you can adjust your rebuttal time, but just if you want to briefly address your other points, then we'll hear from your opponents. Certainly. Thank you, Your Honor. Discovery's pitch was also that Warner had an ongoing practice of licensing its content to third parties. But on that same August call, the CFO said they were revising earnings down by $2 billion. And the number one reason for that was for Warner, quote, new content licensing deals to third parties were largely halted, and content was, in general, made exclusive to HBO Max. That decision to largely halt third-party licensing, that was made pre-merger, but it was never disclosed pre-merger. That omission about halting licensing, we believe, made Discovery's offering documents misleading. Thank you, Counsel. Thank you. We will hear from opposing counsel. Mr. Polks, you have ten minutes. Good morning, Your Honors. Jonathan Polks. I'm from Weill-Gottschall, representing the appellees. May it please the Court. If it's okay with Your Honors, I'd like to actually respond to points that were made, first by Judge Jacobs, with regard to, isn't revenue still coming in? Then, Your Honor, Judge Cronin, with regard to the legal issues surrounding the reporting of accurate information. We ask questions. We don't make points, but feel free to respond to those questions. Respond to those questions, then. And then yours, too. Your question as well about the nature of the original disclosure and wasn't the methodology disclosed. So if I can get all of that in, I'm going to start there. Judge Jacobs, you asked about whether revenue wasn't still coming in. And the fact is that if you look at the pleading carefully and the disclosures, all that happened post-closing is the methodology of reporting subscribers changed. The number of actual subscribers is not alleged to have changed at all. The people who were obtaining HBO Plus through bundling continued to get HBO Plus through bundling. There was no pleading to the contrary. And the only thing that happened is they wouldn't subscribe but for the bundling. They may have changed their minds at some point in the future. Things change. But in terms of was the revenue real and did it continue post-closing, the answer is absolutely. And to be clear, this entire premise of the idea that there was something misleading is based on statements made by the CFO in the second quarter earnings call in which he simply announced very clearly that there was going to be a change in methodology as to how they reported it. I'd like to point out that my colleague, when he said the company was touting the 100 million subscribers in connection with the merger, that statement was actually made, the 100 million subscribers statement, was actually made post-closing in the first quarter earnings call. And I think it's relevant to the — to Your Honor's considerations. Well, how could a merger go ahead without there being some disclosure as to the number of subscribers to a streaming service? It had been disclosed. The disclosure was the one that they're challenging as having been misleading. But when he says they were touting 100 million, that's a reference to a statement that was made. It's in the joint appendix at page 810. And I just would like to read it because I think it sheds some light on this issue. The CEO said, adding the two subscriber bases, we ended the quarter with just over 100 million subscribers. He then says the following, please note we're still working through alignment of our subscriber definitions and the focus of our subscriber reporting going forward, after which we will have a more refined and detailed update when we report second quarter results. So that was announced in the first quarter. That's the 100 million subscriber statement that counsel was referring to. And then in the second quarter, indeed, they announced the following. We're changing the way we present our subscriber numbers going forward. And what they were — the way they were changing it, they're quite clear in the statement, was to adopt the legacy discovery methodology, which was to only take direct subscribers. You now have two companies. You had Discovery, which was acquired Warner. Warner did it one way. Discovery did it another. And it's the CFO, appropriately enough, saying we're going to report it the way legacies — the legacy discovery way. That resulted in a reduction in the reported number of subscribers, but to Your Honor's point, not in the revenue. Those bundled subscribers continued. They just were being reported differently. The company didn't even have to do this. They could have just left them as the way they — they could have reported it the way they had been — that had been done historically. I think your adversary's argument is that it's no small thing not to disclose an anticipated change in licensing policy or a way in which customers will be counted, which is a metric that would be important for the value of the shares, and that there will be a major change in policy for distribution of movies. Well, that — Between streaming and theater. That perhaps goes to the other judge's questions. One, to Judge Merriman's question, the methodology that had been used historically by AT&T and which was reported in connection with the proxy statements was fully disclosed. And I'll read from the disclosure, which is one of the challenge statements. The Warner Media business had approximately 69.4 million HBO Max subscribers, including accounts that have access to HBO Max through bundled services that may not have signed in. It's just a true statement. And so the disclosure was full, and I think that takes us to Judge Cronin's question. Let me ask you a question, though, first.  You just quoted from page 810, I believe, of the joint appendix — Yes. — which was an earnings call in April 2022. The offering documents were a little bit before that, but the complaint also alleges a joint press conference in May 2021 where Zaslav made a very similar statement. He apparently stated that the new company's focus was going to be to get to 200 million, 300 million subscribers, and he added, we're almost at 100 million now. So he was touting the 100 million target number well before the earnings call you're pointing to. That's true, Your Honor. What I meant to focus on in that statement that I was just reading was the already telegraphing, we're going to be addressing how we report this. That is — all this is is a question of changing the reporting, which I think does go to your question, Your Honor. This — one of the problems with this argument, besides just looking at the statements on their face, is my colleague's argument walks directly into a brick wall of authority that says reporting historically accurate financial data simply is not actionable. And there are a number of cases that stand for that proposition. One of them is the Dotska case, which Your Honor decided. We have cited the others, the Boca Raton case, the IBM case. And Judge Caproni, in her decision, cited a bunch that are remarkably on point. The fact of the matter is that there is no question, even as we stand here today, that the original numbers were fully accurate. They were truthful. The methodology pursuant to which they were derived was disclosed, also truthful. There was a change in methodology, which resulted in a change in the number reported. You know, one way to look at this, Your Honors, is that, again, they didn't have to do it. But it's not even an omission from the earlier disclosures. Your Honor has referred to these things as there's got to be a nexus between the allegedly omitted information, which comes out later, and the original statement. And there really isn't here. The original disclosure, which is the one that's now being challenged as having been rendered misleading, is 100 percent true, given the definition that is provided here. If you change the definition, well, then, of course, you're going to get a different number. And that is all that happened here. The revenue never changed. But didn't the definition change because of the symbolic value of 100 million subscribers? How do we deal with the symbolic value of 100 million? They never had to change it. The way I would answer your Honor's question sort of wasn't there some kind of marketing impact of this. But if that was true, if that was sort of sufficient, the company did not have to change it. That was a voluntary thing that was done. Again, all they did, by the way, they didn't sort of come up with a new reporting system out of the blue. They reconciled the legacy way of reporting it for one of the merged companies with the other. And they said, told everyone exactly what they were doing, and even foreshadowed it, which is the language I was referring, Your Honor, to in the Q1 call. I see a – if I could, Your Honors, let me just move on to the second real set of issues. I think this one I'm just going to sort of cut right to the chase. There is a factual issue, a factual problem that it's not misleading at all. And then there is a legal issue as well in this case. So I'm just going to get to those. The statement which is – the subsequent statement from the earnings call, which is sort of causing all of this, is a statement that from the CFO, as part of a corporate initiative to prioritize HBO Max growth globally, new content licensing deals – new, I want to emphasize that word – to third parties were largely halted. And there were original statements with regard to depending on revenue from third parties. Those statements are completely harmonious. Again, it's not even an omission from the original statements. Let me just point to what those are, because I think that they really matter here. The statements were that WarnerMedia produces – the content that it produces is also licensed to third parties. That was true before. It's true after. It doesn't change. There's nothing inaccurate about that at all, even in hindsight. The second statement, WarnerMedia has over 100 active series being sold to over 20 platforms. No one says that's not true, even in light of the subsequent information. What you have is – and then there's the risk disclosure issue, which the appellants focus on, I do want to note, for the first time in their reply brief. They never focused on this issue below. It's not in their complaint. It wasn't in any of the briefing. It wasn't in their opening brief. Here's for the first time in the reply brief, which is that there's a legal issue that we were disclosing a known risk. Not so. The setting aside the waiver issue. The statement – the risk disclosure is WBD will be dependent upon the maintenance of such licensing and distribution agreements with third parties. That's true. That continues to be true. The issue that the company was talking about in their Q2 earnings call – remember, this is after their very first quarter as a merged company, so this is management now for the first time with a quarter under its belt talking about what happened – said that they started to halt new licensing deals. That's a question of business strategy. It's clearly not a risk coming – there's no – it's not a risk that the company may choose to move forward with a different way of earning its revenue. The risk would be they've got all these existing licensing agreements, which may get  That didn't happen. This was a voluntary decision by prior management to move business strategies, and you have new management disagreeing with that business strategy. And I'll just finish with this, Your Honors. That leads to the legal problem I foreshadowed, which is there is another solid line of cases, Second Circuit, Southern District, Eastern District, all saying there is no duty to disclose change in business plans unless you have disclosed the business plan and asserted you're going to rely on it, i.e., not change it. It's the Time Warner case. There's a bunch of others. And no one says that happened here. There is no – if the original statements had said, by the way, we will never change our model of relying on third-party licensing, and they had secretly done that, of course that would be a different situation. But there is no such claim. And absent that, as I say, I believe just like the first alleged disclosure, this one just runs into a brick wall of authority that it can't get through. So unless there are any further questions, Your Honors, I will yield. Thank you, Counsel. Thank you. We'll hear from appellants again. You have reserved three minutes. And before you get started with responding to those issues, let me just make sure that I'm clear on something. In the amended complaint, there are a variety of allegedly misleading or omitted statements discussed. On appeal, you appear to be focused on two, right? And the licensing. Is that right? There's also a third, Your Honor. Okay. Which is about the direct-to-streaming choices. Okay. So those three are the focus on appeal. That's correct, Your Honor. Thank you. So to pick up where we just left off, it's not – it is not accurate to say that the offering statements had a – were disclosing, hey, this is just generally our policy, and then later the company makes a policy change. Our contention is that, as best we can infer from the earnings call in August, as of the time the offering statements were made about we have this ongoing practice of third-party licensing, Warner had, quote, largely halted. They had already halted. Largely halted new licensing. Well, it's a little bit more than that, Your Honor. What's that page again from the appendix? So that is the largely halted statement is at page 66. Well, that's where you allege it. Well, that is a – oh, excuse me. I think that's a quote.  I have the quotation as well. 834 in the appendix. So 137, the CFO, which is page 66 of the appendix, and this may – I think that you're referring, Your Honor, to the transcript. I'm looking at the quotation itself rather than your allegation about the quotation, in which you take a piece of the larger paragraph. Right. So the actual quotation is at 834 in the appendix. And your allegation about it is on page appendix – joint appendix at 66, right? That's right. Including this quotation, new content licensing largely halted. And there's a second part. Content was in general made available exclusive to HBO Max, which we argue is in conflict with the statement that we've got over 100 active shows being licensed to over 20 platforms and services. The implication surely is not that they're no longer going to use – deploy that content to get revenue. It means, I take it, that they're not going to have that – have that content displayed on other – on other – Right. So if you want to watch Casablanca or something else – They can use it for themselves. That's – that was indeed the optionality they presented as having. Our contention is that they had already exercised that option and didn't disclose that they had committed to that strategy. If I may, I wanted to – Well, I mean, if you're going to – if you're going to – if you're going to buy into your franchisees, for example, you're going to get less money from franchising. But then you're going to make more money from restaurants. It – there's no – there's no loss there if you are going to have reduced revenue from one way of deploying your assets when you're planning to use them in a different way. So the option to either use the revenue from licensing to advertise for more subscribers or alternatively play hardball with subscribers and say, if you want to watch The Wizard of Oz or whatever, you've got to go to HBO Max, that was – that optionality was presented, Your Honor, by the CEO at, for example, page 68 of the joint appendix, paragraph 142. He talks about – he talks about optionality, but the facts, as alleged, are that Warner had, in fact, already exercised the specific option and it had turned out to be a money loser. That's – that is our – that's our contention. That's the number one reason why – that the CFO gave for this $2 billion downgrade in their earnings forecast, essentially. I wanted to mention very, very briefly the – we talked about the Donska case, Donska Bank, and accurate historical numbers. There's – the standalone point about accurate historical numbers does not – does not qualify or eliminate the duty to disclose material facts to make statements not misleading. Donska Bank was not – didn't drill in on that specific point. There's a lot of confusion about speaking to same versus related subjects, and I would direct the Court to our discussion of the Morgan Stanley case, where my opposition presents it as really narrowing the duty to disclose, and if one reads the case more closely, it's actually not quite so restrictive on the duty of disclosure. All right. Thank you, Counsel. We have your argument.  We'll take the matter under advisement and reserve decision. Thank you both for your arguments.